IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Jane Doe, et al., ) | **CIVIL ACTION NO.: 3:06-3663-JFA** |
| ) | **3:07-1629-JFA** |
| Plaintiff, ) | |
| ) | **PLAINTIFFS' RESPONSE AND** |
| v. ) | **MEMORANDUM OF LAW IN** |
| ) | **OPPOSITION TO DEFENDANTS'** |
| South Carolina Department of Social ) | **MOTION FOR SUMMARY** |
| Services (SCDSS), et al., ) | **JUDGMENT** |
| ) | |
| Defendants. ) | |
| Jane Doe, et al., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| South Carolina Department of Social ) | |
| Services (SCDSS), et al., ) | |
| ) | |
| Defendants. ) | |

PLAINTIFFS, BY AND THROUGH THEIR COUNSEL, respond in opposition to Defendants' Motion for Summary Judgment with the following arguments:

## I.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when, after considering the full evidentiary record, there are no genuine issues of material fact. R. 56(c), Fed.R.Civ.P. The court is not to weigh the evidence, but determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, the burden for summary judgment may be discharged by "pointing out to the court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Evidence should be viewed in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. A "mere scintilla" of evidence, however, will not preclude summary judgment. The court's inquiry is "not whether there is literally no evidence, but whether there is any [evidence] upon which a jury could properly…find a verdict for the party"

Plaintiffs' Response to Defendants'
Motion for Summary Judgment

Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA

resisting summary judgment. *Id.* at 251. All evidence must be viewed in favor of the party

opposing the motion. Rule 56(c). The court must "indulge all inferences" favorable to that party.

*Moreau v. Local Union No. 247*, 851 F.2d 516 (1ˢᵗ Cir. 1988) (Fuste, J.).

The parties are still at the beginning/close to the middle of discovery. Although the United

States Supreme Court held that a conclusion for summary judgment may be granted only after the

nonmoving party has had an "adequate time for discovery," *Celotex Corp. v. Catrett*, 477 U.S. 317,

322, some circuits have upheld the granting of summary judgment before discovery is complete.

See *Alholm v. American Steamship Co.*, 144 F.3d 1172, 1177 (8th Cir. 1998) (noting that Rule 56

does not require that discovery be closed before motion can be heard).

Plaintiffs ask that they be allowed to continue with discovery and depositions. See *Doe v.

Abington Friends Sch.*, 480 F.3d 252, 257 (3rd Cit. 2007) ("well established" that opposing party

must be given "adequate opportunity to obtain discovery").

## II.    STATEMENT OF MATERIAL FACTS

This case stems from the adoption, on November 20, 2003, by the Plaintiffs, Michelle and

Gregory Johnson, of Jane Doe. The Johnsons have two biological children, both sons.[1] Because

they have always wanted a larger family and could not have more children, they looked into

adoption through the South Carolina Department of Social Services (SCDSS) after meeting their

friends' foster children.[2]

---

[1] Affidavit of Gregory and Michelle Johnson, *9.
[2] Affidavit of Gregory and Michelle Johnson, *1.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

On June 1, 2002, the Johnsons, in their application for the adoption,[3] checked that they could not adopt a child with certain behaviors such as sexual aggression with children, bedwetting, and soiling, although they wrote that they could adopt a child who had been abused, writing, "[w]e both understand these children are in the system because of abuse, neglect, etc. and fully understand the therapy issues." The Johnsons also checked that they could not adopt a child with incest problems.[4] In SCDSS' Family Assessment Summary/Pre-Placement Investigation, SCDSS wrote that the Johnsons "cannot accept a child of rape" and "they could not take a child who is very sexual or aggressive."[5]

In her affidavit, Deborah Thompson stated that she gave all the facts to the Johnsons and that she did not receive any reports of inappropriate behavior or inappropriate contact between Jane Doe and Kameron Cox."[6] She then added, "[a]t no time did anyone report or suggest, or did I observe any behaviors which would lead me to believe that Jane Doe and Kameron Cox had any inappropriate contact."[7]

The SCDSS file is, quite literally, replete with reports, suggestions, and observations of behaviors about not only inappropriate behavior and contact between Jane Doe and her biological older brother, Kameron Cox, but also between Jane Doe and another child.

### III.     REPORTS OF SEX ABUSE OF JANE DOE

---

[3] See Exhibit F-2.
[4] See Exhibits F-3 and F-4.
[5] See Exhibit F-3 and F-4.
[6] See Affidavit of Deborah Thompson, *3, paragraph 6.
[7] See Affidavit of Deborah Thompson, *4, paragraph 6.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

The following is basically a summary report of SCDSS' file, noting the many documents about the sex abuse of Jane Doe,[8] very little of which (and always downplayed) was reported to the Johnsons:

The only information SCDSS disclosed in its Adoption Summary to the Johnsons on or about January 15, 2003 was the following:

On January 17, 2003, Deborah Thompson wrote,

- "There have been no reports of any sexually inappropriate behavior from Kameron since entering care.[9]
- [Jane Doe] seemed to have had an attachment to the first foster family with whom she and Kameron resided, but this attachment appeared to be rather superficial, as [Jane Doe] was displaying some features of sexual abuse.  This meant that [Jane Doe] would indiscriminately hug, kiss, or interact with people she had just met.[10]
- A CPS (Child Protective Services) complaint was received on August 5, 1999, alleging that [Jane Doe] had been sexually abused.[11]
- [Jane Doe] disclosed sexual abuse to CPS staff, but her accounts and named perpetrators were inconsistent.  She alternately named her birth mother, Kameron, her maternal grandfather, and her mother's paramour.  Initially, Kameron denied any sexual contact with [Jane Doe], but later appears to have disclosed to DSS staff inappropriate conduct with [Jane Doe].[12]
- Although the allegations of sexual abuse were held in abeyance at subsequent court proceedings, there was a finding of physical neglect.[13]
- On September 16, 1999, Kameron and [Jane Doe] underwent a medical forensic examination to determine if there was evidence of sexual abuse.  Kameron did not disclose any abuse and denied any sexual contact with [Jane Doe].  [Jane Doe]'s examination revealed a labial adhesion of unspecific origin that could have been

---

[8] Jane Doe's name at the time of entry into the custody of SCDSS was "Xxxxxx Xxxxx Xxx."  There are many documents which refer to Jane Doe as simply "Xxxxxx" or "Xxxxx Xxxxx."
[9] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0784.
[10] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0787.
[11] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0790.
[12] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0790.
[13] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0791.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

caused by any type of irritation. [Jane Doe] did not disclose any sexual abuse to the examiner.[14]

- The birth mother admitted to being sexually abused by her brother and a friend of her brother beginning when she was 13 or 14 years of age. She also told the evaluator that this same brother resided with her, Kameron, and [Jane Doe] and that he shared a bed with Kameron.[15]

- Kameron described inappropriate sexual contact between his birth mother and himself, but denied any inappropriate contact with [Jane Doe] or any personal knowledge of any inappropriate contact between [Jane Doe] and the adults in the home.[16]

- The evaluator was unable to substantiate any sexual abuse of or by Kameron and unable to substantiate sexual abuse of [Jane Doe], but she was not able to rule out sexual abuse either.[17]

- There was never a finding of sexual abuse of Kameron or [Jane Doe] by the court.[18]

- He [Kameron] understands social and sexual boundaries and there have been no reports of sexual acting out or inappropriate conduct by Kameron.[19]

- The maternal grandfather was alleged to have sexually abused [Jane Doe], but the CPS investigation did not have a finding against him…this might have been due to the fact the investigation did not identify him in a parental role with [Jane Doe] and therefore he would not be part of the DSS finding.[20]

- [Jane Doe] and Kameron's birth mother was sexually molested by her brother who later shared sleeping quarters with Kameron.[21]

Kameron (then 8 years old) and his sister (then 3 years, 10 months old)[22] entered the custody of SCDSS, however, the agency and its workers were almost certain that the children were being sexually abused and that Jane Doe was being sexually abused by her brother, Kameron Cox and her mother's boyfriend, Rex Gass in the time preceding their entry into the protective custody of South

---

[14] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0791.
[15] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0791.
[16] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0791.
[17] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0791 – 0792.
[18] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0792.
[19] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0794.
[20] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0798.
[21] See Exhibit F-22, Defendants' Bates Stamp No. 7353.0797.
[22] See Exhibit A.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

Carolina Department of Social Services (SCDSS).[23]  The children's mother even disclosed to

Kameron and Jane Doe's Guardian ad Litem that Kameron had been sexually improper with his

sister.[24]  During her time in SCDSS's custody, Jane Doe continued to disclose sex abuse by Rex[25]

and her brother, Kameron.[26]  Additionally, Jane Doe exhibited sexual knowledge, sexual behaviors,

and sexually acting out with other children while in the custody of SCDSS.[27]

During the fall of 1999, soon after they entered state custody, the children underwent a

Sexual Abuse Assessment (Assessment) with Joy Bennett, a therapist who would later become their

full-time therapist.[28]  The purpose of the investigation was to determine if Jane Doe had been

sexually abused by her brother, her mother, her mother's boyfriend, and her maternal grandfather.[29]

Kameron was seen alone on two occasions and the two children were seen together for almost all of

the remainder of the visits.[30]  Jane Doe was so traumatized during the assessment that she would not

enter the room alone without her brother, one of her sex abusers.[31]  The therapist had, in all

practicality, almost no opportunity to interview four-year-old Jane Doe alone.[32]

---

[23] See Exhibits C-1; C-2; C-3; C-4; B-1, Plaintiffs' Bates Stamp No. 001417, 001420 – 001422; C-5; C-7; C-8; C-9; C-10; B-2, Plaintiffs' Bates Stamp No. 001406, 001409 – 001416: C-11; C-13; C-14; C-15.
[24] See Exhibit C-7.
[25] See Exhibits B-1, Plaintiffs' Bates Stamp No. 001038 – 001041, 001359, 001390, 001400, and 001401; I-6; B-8, Plaintiffs' Bates Stamp No. 001352, 001356; B-3; C-15.
[26] See Exhibits B-1, Plaintiffs' Bates Stamp No. 001406; B-5; B-8, Plaintiffs' Bates Stamp No. 001351, 001356, 001381; B-6; C-14; C-18.
[27] See Exhibits B-1, Plaintiffs' Bates Stamp No. 001359, 001367, 001401, 001406; I-9; B-8, Plaintiffs' Bates Stamp No. 001349, 001351, 001354, 001359; B-6; C-16; C-17.
[28] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001408 – 001416.
[29] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001408.  The opening paragraph of the assessment states "maternal grandmother" instead of "maternal grandfather."
[30] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001408.
[31] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001415.
[32] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001415.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

During the therapy sessions with Joy Bennett, Kameron disclosed that his birth mother performed oral sex upon him.[33] Kameron disclosed that "he doesn't know if that happened to [Jane Doe], but he 'saw' Mama lick his."[34] The therapist wrote that Kameron disclosed, "…that he was playing in the house and she took him into his room, took his clothes off, and licked his private."[35] When Joy Bennett asked Kameron "…what it felt like, he shrugs and states, 'Goodish.'"[36] Kameron states "…that [Jane Doe] says Rex and his papa licked her[ privates]."[37] "When asked about touching [Jane Doe]'s private parts, Kameron states that one time he poked her accidently in the privates when his elbow hit her during a game of hide and seek."[38] Kameron denied sexually abusing his sister.[39] However, when "this evaluator asks Kameron about telling Miss Margaret [Young] (the DSS worker) something different than touching [Jane Doe]'s privates while playing hide-and-seek…,[h]e pauses and then states that he forgot to tell me that once he rolled over on [Jane Doe] in the bed."[40] Joy Bennett saw Jane Doe alone only for about fifteen minutes during the sexual abuse Assessment and wrote, "Because [Jane Doe] declined to be seen alone, this evaluator did not question her further about sex abuse."[41]

---

[33] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001410.
[34] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001410 – 001412.
[35] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001410.
[36] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001411.
[37] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001410.
[38] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001411.
[39] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001411, 001413.
[40] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001413.
[41] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001414.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

Joy Bennett found the assessment to be inconclusive.[42]  While "…there was some question…in this evaluator's mind as to the validity of Kameron's statement that his mother "licked" his private when he was younger...," Joy Bennett speculates that there was a "…further possibility explaining the vagueness of Kameron's report of sexual abuse by his mother might be that he dissociated during the experience…While dissociation is not uncommon for children being sexually abused, it is rather uncommon as a response to a one-time event of abuse.  Most children who begin to dissociate do so after many incidences of abuse or after traumatic abuse involving an overload of fear or pain in their coping systems."[43]

The therapist also summarized that:

"Kameron became defensive whenever asked about his possible sexual touching of [Jane Doe].  The children have been questioned extensively by Francis [the children's aunt] and questioned by at least one DSS worker.  A smart child will often become defensive under these conditions if they feel they might get in trouble.  Kameron is smart enough to know to deny any touching if he fears he will get in trouble.  He admits that he lies and steals, but he has also had traumatic repercussions (removal from his mother) due to sexual abuse allegations.  *It cannot be ruled out that Kameron has touched [Jane Doe] inappropriately.*"[44]

Joy Bennett's recommendations were that Kameron and Jane Doe "begin therapy to continue to express their feelings and fears…" and that "…they be placed together whenever possible, and that *they receive a high degree of supervision when alone to prevent any abuse to*

---

[42] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001414.
[43] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001414.
[44] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001415.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

*[Jane Doe] by Kameron*.   [Jane Doe] needs the highest possible degree of continuity in…contact with familiar people."[45]

Despite Joy Bennett's warnings to keep the children under a high degree of supervision,[46] the fact that Kameron and Jane Doe disclosed to DSS workers Margaret Young and David Barnes and others that Kameron had been molesting his sister,[47] and that the children demonstrated signs of sexual abuse,[48] SCDSS placed the children on September 25, 2000, in a regular foster home (the Cutshalls) with about five or six children.[49]   Regular foster care does not provide the high degree of supervision that Ms. Bennett recommended.

Later, on 24 October, 2001, Jane Doe disclosed that Kameron sexually assaulted her while they were housed at the Cutshalls.[50]   Earlier that summer and into the fall Kameron and [Jane Doe's] incestuous sexual behaviors at the Cutshalls escalated and signs of inappropriate sexual behavior were reported to Jane Doe's therapist, Joy Bennett on June 18,[51] June 19,[52] June 26,[53] June 27,[54] August 6,[55] August 22,[56] August 23,[57] November 2,[58] and November 14.[59]   Deborah

---

[45] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001416 (emphasis added).
[46] See Exhibit B-2, Plaintiffs' Bates Stamp No. 001416.
[47] See Exhibits B-1, Plaintiffs' Bates Stamp No. 001406; B-5, Plaintiffs' Bates Stamp No. 001381; B-8, Plaintiffs' Bates Stamp No. 001351, 001356, 001381; B-6, Defendants' Bates Stamp No. 7253.0255 – 0257; C-14; C-18.
[48] See Exhibits B-1, Plaintiffs' Bates Stamp No. 001367, 001401; C-2; C-3.
[49] See Exhibit A; D-5.
[50] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001351.
[51] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001381.
[52] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001381.
[53] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001356.
[54] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001378.
[55] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001354.
[56] See Exhibit B-6, Defendants' Bates Stamp No. 7353.0255 through 7353.0257.
[57] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001354.
[58] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001359.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

Thompson not only asked for the children's files from Joy Bennett which reflects these behaviors,[60] but she also received a letter directly from Kameron and Jane Doe's counselor summarizing these behaviors and disclosures.[61] Lastly, Deborah Thompson received a phone call on November 15, 2001 from the children's foster mother and Deborah Thompson recorded that, "[s]he is exhibiting more sexual behaviors, including Janice finding her and…(Janice's younger son) on each other."[62]

Kameron would later disclose that he raped three other children in addition to Jane Doe while living in this household.  Kameron later disrupted this foster placement due to 1) his attempted battery on his sister (choking her), 2) homicidal ideations against his sister, and 3) suicidal ideations.[63]

At the time of his entry into care at Marshall I. Pickens,[64] Kameron disclosed past sex abuse against his sister.[65]  David Barnes was the Foster Care Worker for Kameron and Jane Doe and he worked on the file with Deborah Thompson.[66]  David Barnes was the social worker who applied for and received permission from SCDSS to place Kameron in Marshall I. Pickens.[67]  Deborah

---

[59] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001349.
[60] See Exhibit E-2b, letter from Deborah S. Thompson and Sharon Cook to Joy L. Bennett of Compass of Carolina.
[61] See Exhibit B-6; H-6.
[62] See Exhibit H-7.
[63] See Exhibits D-2; D-3; D-6.
[64] See Exhibits D-1 through D-7.
[65] See Exhibits D-6; B-8, Plaintiffs' Bates Stamp No. 001381.
[66] See Exhibit A.
[67] See Exhibit D-3; D-6.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

Thompson was briefed on the causation and purpose of Kameron's stay at the hospital.[68]  Deborah

Thompson also applied for and received a copy of Kameron's records from Marshall I. Pickens.[69]

Jane Doe and Kameron were then separated for the first time ever.[70]  On October 24, 2001

Jane Doe disclosed that her brother sexually assaulted her while they were placed together in the

home of Janice Cutshall.[71]  Jane Doe also began to disclose other sex abuse (that occurred before

she was placed in state custody) from her mother's boyfriend, Rex Gass.[72]  Joy Bennett informed

David Barnes of her disclosures by phone and by letter.[73]  Joy Bennett also informed Deborah

Thompson by letter.[74]  Because Jane Doe no longer had her brother to have sex with, she became

sexually aggressive with other children in the Cutshall Home as "sex is a way for [Jane Doe] to

show sibling love."[75]  Mrs. Floyd, the foster mother, caught Jane Doe "humping" her toddler son

and reported it to Joy Bennett[76] and Deborah Thompson.[77]

Deborah Thompson began working as Jane Doe and Kameron's adoption worker, as early as

May 30, 2001.[78]  On July 30, 2001, Deborah Thompson and her Adoptions Supervisor, Sharon

---

[68] See Exhibit F-9.
[69] See Exhibits E-2c; E-8; F-9.
[70] See Exhibit A.
[71] See Exhibits B-8, B-6, B-3.
[72] See Exhibits B-8, B-6, B-3.
[73] See Exhibits B-1, Plaintiffs' Bates Stamp No. 001356, 001382, 001384, 001387; I-9; B-5; B-8, Plaintiffs' Bates Stamp No. 001349, 001351, 001352, 001354, 001359; B-3.
[74] See Exhibit B-6, Defendants' Bates Stamp No. 7353.0255 – 0257.
[75] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001349, 001351, 001359.
[76] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001349 and 001351.
[77] See Exhibit H-7.
[78] See Exhibit E-1.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

Cook wrote and signed an "Assessment Analysis" for Jane Doe.[79]  Little is disclosed, as the two SCDSS workers wrote, "…[Jane Doe] and her brother, Kameron were taken into DSS custody by EPC [Emergency Protective Custody] on 8/6/99 as a result of an allegation of sexual abuse…Although the allegations were held in abeyance at subsequent court proceedings, there was a finding of physical neglect according to a FCRB [Foster Care Review Board] summary dated 06/18/2001."  The two adoption workers continued, "She is described as extremely clingy to adult males, referring to all adult men at church as 'daddy.'"  Lastly, on the third page under "What services are needed to achieve adoptive permanence for this child?," Deborah Thompson and her supervisor write, "Continue therapy for depression, grief and loss, possible sexual abuse, and explosive behaviors…Secure and evaluate background information and prepare summary for child."[80]

Again, there is no mention of the numerous disclosures all known to SCDSS before the Johnson's adopted Jane Doe-by Jane Doe of Kameron's sexual abuse of his sister, or even of another disclosure by Kameron which occurred only the month prior to the SCDSS, writing of this Assessment Analysis.[81]

After Kameron's release from Marshall I. Pickens, SCDSS sent Kameron to a new foster home with a clean slate, placing him in a Therapeutic Foster Home in Richland County with Brenda

---

[79] See Exhibits K-3; K-4.
[80] See Exhibits K-3; K-4.
[81] See Footnotes 23 – 26, Exhibits D-2, D-3, D-6, and B-8.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

and Russell Floyd.[82]  There is no documentation by Deborah Thompson or David Barnes warning

the Floyds that Kameron and Jane Doe had both disclosed that Kameron had sexually assaulted Jane

Doe in the past.[83]  The evidence will show that Deborah Thompson failed to tell the Floyds that

Kameron, while he was at Marshall I. Pickens, had recently disclosed his having sexually assaulting

Jane Doe.  The evidence will also show that Deborah Thompson failed to disclose that Kameron's

sister, Jane Doe, disclosed that her brother sexually assaulted her while the children were living

with the Cutshalls.  The evidence will show that David Barnes (Barnes), Kameron and Jane Doe's

Foster Care worker and Deborah Thompson's colleague, failed to disclose these same issues to the

Floyds although Barnes was very knowledgeable with the children's history of sex abuse before and

after their entry into foster care.  In fact, Jane Doe had made disclosures of sex abuse to David

Barnes on several occasions.[84]  Neither David Barnes nor Deborah Thompson ever make a report of

child abuse to the Child Protective Services Division of SCDSS as mandated by S.C. Code Ann. §

20-7-510(A and D).[85]  Eleven year-old Kameron proceeded to rape his sister and another boy, age 7,

while he was in Therapeutic Foster Care at the Floyd home in Eastover, South Carolina.[86]

  Part of the tragic nature of this case is that, there are no documents to show that Kameron's

disclosures in 2001 (of sexually abusing Jane Doe) made at Marshall I. Pickens were ever passed on

---

[82] See Exhibit A.
[83] See Exhibits M-1, M-2, and M-3.  No further disclosure or warning was made by David Barnes or Deborah Thompson besides the, "inappropriate sexual behaviors," (Exhibit M-1) and "behaviors and allegations of sex abuse" (Exhibits M-2 and M-3).
[84] See Exhibits B-1, Plaintiffs' Bates Stamp No. 001367, 001390, 001401, and 001406; I-6; B-8, Plaintiffs' Bates Stamp No. 001352.
[85] Joy Bennett notes that David Barnes ignored this report.
[86] See Exhibit O.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

to Kameron's new therapist, Titsa Flesch.  In fact, the evidence will show that Deborah Thompson did not even attempt to inform Titsa Flesch as to the extent of the sexual abuse disclosures made by Kameron and his sister.  It can be reasonably deduced that Deborah Thompson desired to keep Titsa Flesch uninformed as to the chronic nature and severity of the sex abuse suffered by Kameron Cox and suffered upon Jane Doe by Kameron.  This is evidenced by the fact the children's Sexual Abuse Assessment for Kameron Cox and Jane Doe from September, 1999 was the only document given by Deborah Thompson to Titsa Flesch.[87]  The evidence will show that Deborah Thompson gave Titsa Flesch only a very small part of the picture, only a half-truth.  She told the children's therapist that Kameron was angry at his sister because he believed Jane Doe's disclosures of sex abuse were the cause of their entry into foster care.[88]  And, for the next year and a half, the children were treated for this problem, past "possible" sex abuse by their mother's boyfriend.

Despite the lengthy record of Kameron's sexually abusing his sister and Jane Doe's disclosures and their chronic aggressive sexual behavior, Deborah Thompson chose to ignore the two recommendations by therapist Joy Bennett that Kameron and Jane Doe be placed together only if Jane Doe is "protected" (See Exhibit B-6, Letter from Joy Bennett to Deborah Thompson, Defendants' Bates Stamp No. 7353.0255 - 0257) and under "a high degree of supervision…to prevent any abuse to [Jane Doe] by Kameron."  See Exhibit B-2, Sexual Abuse Assessment for Kameron and Jane Doe, Plaintiffs' Bates Stamp No. 001416.

---

[87] See Exhibit B-2, Defendants' Bates Stamp No. 7353.1408 – 1416.
[88] See Exhibit G-6; G-15; H-5; H-6; H-7; H-10.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

Even after Jane Doe disclosed that she had been enduring sex abuse by her brother while in foster care at the Cutshalls,[89] Deborah Thompson moved Jane Doe closer to Kameron[90] in order to have a sibling bond assessment performed, reunite the children, and adopt the children out as a sibling group.[91] Deborah Thompson weighted the table even more by never telling Jane Doe's new foster parents, Pam and Bill Hamerick, about the children's incestuous and abusive relationship. The evidence will show that Deborah Thompson never informed Jane Doe's new therapist, Titsa Flesch, of Jane Doe's disclosure of sex abuse in 2001 by Kameron or Kameron's disclosure in 2001 of sexually abusing his sister. Again, the only clue Titsa Flesch had that any sexual abuse had occurred to or between the children was in the 1999 Sexual Abuse Assessment for Kameron Cox and Jane Doe given to her by Deborah Thompson.

At the same time, Deborah Thompson was preparing to put the children on the adoption market. This is called recruitment. For close to twenty months, Deborah Thompson worked to gather information about the children's background.[92] One specific task for the adoption worker is for her to review each child's entire DSS file, including the Child Protective Services and Foster Care files and all social worker notes and dictation on the DSS Database.[93] Deborah Thompson was also required to speak and meet with former and current foster parents, former and current

---

[89] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001351.
[90] See Exhibit A.
[91] See Exhibit C-12; E-6; F-1; G-6; G-7; G-8; G-9; G-12; G-13; G-14; and H-1 through H-21.
[92] See Exhibits E-1 through E-34.
[93] See Exhibits E-1, E-3, E-6.

Plaintiffs' Response to Defendants'
Motion for Summary Judgment

Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA

therapists, former and current social workers, and the birth parents.[94]  For over twenty months,

Deborah Thompson procured and reviewed every medical and school record that she could find for

Kameron and Jane Doe in order to prepare them for adoption.[95]

Around March 2002, Deborah Thompson began to advertise Kameron and Jane Doe on the

internet with South Carolina Seedlings which is operated by the South Carolina Council on

Adoptable Children.[96]  Deborah Thompson appears to have intended to disclose some form of

Kameron and Jane Doe's sexual abuse history.  Deborah Thompson then scratched out those two

disclosures and moved the disclosures to the confidential section of the application.[97]  In the field

for "Confidential Information" on Kameron's application, Deborah Thompson wrote, "There is

possible sexual abuse but this has not been substantiated/founded."  Jane Doe's "Confidential

Information" box states, "[Jane Doe] has been sexually abused.  The truth is that SCDSS actually

did indicate this case for sexual abuse soon after they came into SCDSS' custody in 1999.[98]

On November 12, 2002, Deborah Thompson also wrote a summary about the two children.

Deborah Thompson described Jane Doe, "She can be over cuddly and attentive, especially to males,

and must be provided with guidance about appropriate social boundaries."[99]  And, she continued to

write, "Kameron is in a separate foster home from his sister and initially was not interested in

having her around him.  While Kameron does have some issues to resolve regarding his feelings for

---

[94] See Exhibits E-1 through E-34.
[95] See Exhibits G-1 through G-39.
[96] http://www.sc-adopt.org/seed.htm.
[97] See Exhibits K-1 and K-2.
[98] B-1, Plaintiffs' Bates Stamp No. 001390; C-9; C-10; D-6.
[99] See Exhibit K-1.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

[Jane Doe], part of his desire to be isolated from his sister is attributable to sibling rivalry and the irritation that many 11-year-old boys feel for six-year-old girls. Kameron has made significant progress in therapy in dealing with his resentment of Jane Doe and now looks forward to visits with her."[100]

There is no doubt that Deborah Thompson was-or should have been-intimately familiar with every aspect of Kameron and Jane Doe's backgrounds, including their sexual history. It was Deborah Thompson's job to find out every piece of information-no matter how small-about the children's background so that she could decide whether it was appropriate to place Kameron and Jane Doe together or whether it was safe to place them at all. She was also required by S.C. Code Ann. § 20-7-1740(A)(3)(a-b) to conduct a background investigation compiling the "medical history of the biological family of the adoptee, including parents, siblings, and other family members related to the adoptee including ages, sex, race, and any known genetic, psychological, metabolic, or familial disorders; and… a medical and developmental history of the adoptee."

It is certain that Deborah Thompson was Kameron and Jane Doe's adoption specialist for at least 20 months before the children were placed with Gregory and Michelle Johnson. During Deborah Thompson's time as Kameron and Jane Doe's adoption specialist, she accessed the following records which stated that Kameron had been having sex with his sister:

- B-1, Progress Notes of Joy Bennett
- B-6,  Letter from Joy Bennett to Deborah Thompson
- B-7, Letter from Joy Bennett to David Barnes

---

[100] See Exhibit K-1.

17

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

- B-8, Progress Notes of Joy Bennett
- C-1, SCDSS Investigative Matrix
- C-2, SCDSS Intake and Central Registry Sheet
- C-5, SCDSS Case Transfer/Case Staffing
- C-7, Guardian ad Litem made a Report and Recommendations to the Court
- C-8, SCDSS Worker Activity and Contacts
- C-9, Determination Fact Sheet – Indicated Case
- C-10, Determination Fact Sheet – Indicated Case
- C-11, SCDSS Case Transfer/Case Staffing
- C-14, Guardian ad Litem made a Report and Recommendations to the Court
- D-2, Dr. Jill Golden's Medical Assessment of Kameron
- D-3, Clinical Assessment/History
- D-6, Adolescent Program Psychosocial Evaluation

The documents listed above directly contradict Deborah Thompson's sworn affidavit

submitted with Defendants' Motion for Summary Judgment which states:

> "During my relationship with Jane Doe, I did not receive any reports of inappropriate behavior or inappropriate contact between Jane Doe and Kameron Cox. Per my regular practice, I visited the children regularly and documented all of my contact with the children, their foster parents and their prospective parents, Gregory and Michelle Johnson. *At no time did anyone report or suggest, nor did I observe, any behaviors which lead me to believe that Jane Doe and Kameron Cox were having any inappropriate or sexual contact.*"[101] See Affidavit of Deborah S. Thompson, page 3 through 4, attachment to Defendants' Motion for Summary Judgment, emphasis added.

Additionally, Deborah Thompson even wrote a letter to Kameron and Jane Doe's Foster

Care worker David Barnes[102] in which she quoted a portion of a letter from the children's therapist,

Joy Bennett, which was addressed to Deborah Thompson. In that letter, Joy Bennett stated:

---

[101] Affidavit of Deborah S. Thompson, *3 - *4, emphasis added.
[102] See Exhibit H-6.

18

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

"[Jane Doe] also shows some signs of sexual abuse, including over familiarity with males and a history of trying to sneak into Kameron's bed, probably for comfort through sexual contact. *It is unclear what the exact history of sexual abuse is for [Jane Doe] and Kameron, but it is very likely that they have engaged in inappropriate sexual encounters with adults and with each other.*"[103]

The record is certain that Deborah Thompson ordered and received Kameron's medical records from Marshall I. Pickens Hospital in Greenville.[104] In those very records, Kameron disclosed sexually abusing his sister, Jane Doe.[105]

On November 12, 2002, Deborah Thompson and her Adoptions Supervisor wrote a Social Summary for Jane Doe.[106] In that document, Deborah Thompson writes, "The details of the abuse have never fully been understood, as [Jane Doe] has changed the details related to the abuse many times. It appears that she might have been abused by her birth mother and the birth mother's paramour. Alternately, there have been allegations against the maternal grandfather. Kameron and Jane Doe have both acknowledged inappropriate behaviors between each other."[107] This sentence is still not accurate and it still does not reflect the knowledge that Deborah Thompson had garnered through her discussions and communications with Joy Bennett, the children's therapist, and David Barnes, the children's Foster Care worker. This statement, however, even as a half-truth, is still contradictory to the Adoption Summary that Debbie Thompson submitted to the Johnsons and later

---

[103] See Exhibit B-6, emphasis added.
[104] See Exhibit F-9; E-2c; E-8; F-9.
[105] See Exhibits D-2, D-3, and D-6.
[106] See Exhibit E-8.
[107] See Exhibit E-8.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

to the Kershaw County Family Court.[108]  It also contradicts Deborah Thompson's affidavit

submitted to this Court as part of the Defendants' Motion for Summary Judgment.  "At no time did

anyone report or suggest, nor did I observe, any behaviors which would lead me to believe that Jane

Doe and Kameron Cox were having any inappropriate or sexual contact." [109]

Debbie Thompson also wrote, "[Jane Doe] and Kameron remained together in this home

until July 2001, when Kameron was briefly institutionalized for suicidal tendencies and threats

made against [Jane Doe].  Kameron had blamed [Jane Doe] for their entry into foster care, as she is

the one that disclosed sexual abuse."[110]  These sentences are, again, a gross understatement.

Deborah Thompson failed to disclose that Kameron tried to choke his sister, stated he wanted to kill

her, and was found lying on his bed with a jump rope around his neck in an attempt to commit

suicide.[111]  Deborah Thompson failed to write that Kameron admitted to sexually abusing his

sister.[112]  Finally, Deborah Thompson failed to state that [Jane Doe] only three weeks before, on

October 24, 2001, had disclosed that Kameron sexually abused her while they were in the foster

home of Janice Cutshall.[113]

## RESPONSE TO DEFENDANTS' ARGUMENTS

### A.  THE DEFENDANTS' MOTION SHOULD BE DENIED AS TO PLAINTIFFS' 42 U.S.C. § 1983 CLAIMS.

---

[108] See Exhibit F-22, Defendants' Bate Stamp No.'s 7353.0779 – 0799.
[109] Affidavit of Deborah Thompson, *3, paragraph 6.
[110] See Exhibit E-8.
[111] See Exhibits D-1 through D-7.
[112] See list, Page 17 and 18.
[113] See Exhibit B-8, Plaintiffs' Bates Stamp No. 001351.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

The Defendants' motion should be denied based on violations of the Plaintiffs' due process right. The Defendants acted affirmatively and in such a manner as to violate constitutional duties toward Gregory and Michelle Johnson and Jane Doe. The Defendants have filed the present motion arguing essentially that when their affirmative and negligent acts cause serious harm to wards of the state and third parties, there is no remedy; however, when the state acts affirmatively to increase the risk of harm to an individual, due process guarantees that individual will have a remedy if such harm results. For this reason, Defendants' motion as to Plaintiffs' § 1983 claims fails on the merits.

    1.   <u>**Defendants' affirmative acts violated the due process rights of Gregory and**</u>
        <u>**Michelle Johnson by placing a dangerous child in their home.**</u>

It is well settled that the "Constitution is a charter of negative liberties; it tells the state to leave people alone; it does not [generally] require…the state to provide services, even so elementary a service as maintaining law and order."[114]  In *Pinder v. Johnson*,[115] the United States Court of Appeals for the Fourth Circuit cited the *DeShaney* Court's conclusion that:

> "if the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."[116]

---

[114] *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982).
[115] 54 F.3d 1169, 1174  (4th Cir. 1995).
[116] 54 F.3d 1169, 1174 citing *DeShaney*, 489 U.S. at 196 – 197.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

In *DeShaney v. Winnebago County Department of Social Services*,[117] the majority held that, outside of the custodial setting, the State does not have a constitutional obligation to protect those who are in danger of being harmed by third parties. This is so even when, as in *DeShaney*, the State knew of the danger, took some steps to prevent the harm, and "specifically proclaimed, by word and by deed, its intention to protect him from that danger."[118] The fact that the state in *DeShaney* once took temporary custody of Joshua did not change the result, because the state action "placed him in no worse position than that in which he would have been had [the State] not acted at all."[119] "[T]he State does not become the permanent guarantor of an individual's safety by having once offered him shelter."

In light of this portion of the *DeShaney* Court's analysis, Plaintiffs assert that the state of South Carolina has a constitutional obligation to protect a person from harm when the State itself engages in conduct that enhances the risk of harm. Numerous lower court decision have addressed the issues of "whether" and "under what circumstances" the state's creation of danger, or enhancement of a risk of danger imposes upon the State a due process duty to protect. The United States Court of Appeals for the Fourth Circuit discussed the state-created danger doctrine in *Pinder v. Johnson*[120] but rejected its application to those facts because the plaintiff sought to place liability on a state actor for an act of omission instead of on an affirmative act. Language in *DeShaney*, that

---

[117] 489 U.S. 189 (1989).
[118] 489 U.S. 189, 197.
[119] 489 U.S. 189, 201.
[120] 54 F.3d 1169 (4th Cir. 1995).

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

the state did not do anything to render Joshua "any more vulnerable"[121] to the infliction of harm by

his father, is read across the circuits to imply that state action that enhances the risk of private harm

violates the Due Process Clause.

Judge Posner stated in *Bowers v. DeVito* that "[i]f the state puts a man in a position of

danger from private persons and then fails to protect him, it will not be heard to say that its role was

merely passive; it is as much an active tortfeasor as if it had thrown him into a snakepit." [122]

The Johnsons' substantive due process claims are distinct from *Pinder* and *DeShaney*

because the plaintiffs in those two cases sought liability on state actors based on their omissions.

Deborah Thompson chose to hide the dangerous nature of Jane Doe and discretely, grossly, and

recklessly concealed critical information from the Johnsons.  Deborah Thompson's affirmative act

to hide this information from the Johnsons has placed them in fear for their safety and well-being

for the past five years.  Jane Doe, who is now thirteen, has:

> (1) physically assaulted and battered her parents (at least monthly), (2) threatened to burn
> the family home (many occasions), (3) threatened suicide (many occasions), (4) generally
> and specifically threatened to kill individual family members and friends at school (many
> occasions and as recently as last Friday), (5) assaulted both parents with a knife or box cutter
> (three occasions), (6) been involved in taking a weapon to school (once), (7) destroyed
> property, and (8) harmed animals.[123]

She has also attempted to poison the family pet.[124]  In order to ensure the family's safety, the

Johnsons and their two sons actually lock their doors at night; and, Jane Doe has an alarm on her

---

[121] 489 U.S. 189 (1989).
[122] 686 F.2d 616, 618 (7th Cir. 1982).
[123] See Affidavit of Gregory and Michelle Johnson, p. 13.
[124] See Affidavit of Gregory and Michelle Johnson, p. 13.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

door to warn the family in case she leaves her room.[125]  The Johnsons must check their daughter for

weapons every day before sending her off to school.[126]  The other two Johnson children are afraid

of their sister.[127]

Deborah Thompson had access to and reviewed the entire case file of Kameron and Jane

Doe.[128]  Plaintiffs assert that Deborah Thompson knew that Jane Doe was sexually abused by her

brother, sexually abused even by her mother's boyfriend, and perhaps even by her maternal

grandfather before entering the custody of SCDSS.[129]  Deborah Thompson also knew that Jane Doe

was chronically sexually abused by her brother, Kameron, after entering foster care.[130]

At this stage of discovery, Deborah Thompson quite possibly caused Jane Doe to become

(1) even more dangerous to live with, (2) less able to recover from her chronic and profound

injuries to her psyche, and (3) even more distrustful of anyone in charge of protecting her because

she repeatedly had sex from age 4 until age 8 with her incestuous brother while the state of South

Carolina had legal and physical custody of her!  The evidence will show that Thompson, SCDSS'

agent, failed to inform Jane Doe's new therapist, new foster parents, and the Johnsons of Kameron

and Jane Doe's sexual abuse history.  In other words, it is Plaintiffs' assertion that Deborah

---

[125] See Affidavit of Gregory and Michelle Johnson, p. 13 and 14.
[126] See Affidavit of Gregory and Michelle Johnson, p. 13.
[127] See Affidavit of Gregory and Michelle Johnson, p. 13 and 14.
[128] See Exhibits B-1 through B-8; C-1 through C-18, D-1 through D-7, E-1 through E-34, and G-1 through G-39.  See Affidavit of Deborah Thompson, *4, paragraph 8, "This summary…includes all information available to me about the children including allegations that they had been sexually abused."
[129] See Exhibits C-1; C-2; C-3; C-4; B-1, Plaintiffs' Bates Stamp No. 001417, 001420 – 001422; C-5; C-7; C-8; C-9; C-10; B-2, Plaintiffs' Bates Stamp No. 001406, 001409 – 001416: C-11; C-13; C-14; C-15.
[130] See Exhibits B-1, Plaintiffs' Bates Stamp No. 001406; B-5; B-8, Plaintiffs' Bates Stamp No. 001351, 001356, 001381; B-6; C-14; C-18.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

Thompson knew that Jane Doe was a victim of incest and mentally ill; and her affirmative decisions and actions may have caused Jane Doe to grow much sicker and become even more dangerous and develop serious mental illness.

While the Johnsons never claim to have been in a custodial relationship with the State, they do believe that they were in the requisite "special relationship" with the state to trigger the duty to protect. Where the social worker in *DeShaney* simply had "awareness of a specific risk"[131] and the police officer in *Pinder* made "promises of aid" and he had "specifically proclaimed, by word and by deed [his] intention to protect the victim,[132] Deborah Thompson made an affirmative act to place a dangerous child in the Johnsons' home, thus "creating or enhancing" the dangers faced by all of the Johnsons. The Johnsons have suffered a loss of life and liberty from the "…affirmative misconduct by the [state actor] in creating and enhancing the danger…"[133] by SCDSS, and Deborah Thompson, knowingly placing a severely mentally ill and sexually aggressive child in the Johnson home.

The *Pinder* Court very specifically states that "at some point on the spectrum between action and inaction, the state's conduct may implicate it in the harm caused, but no such point is reached here."[134] The *Pinder* Court is quite correct in holding that "[i]t cannot be that the state 'creates an affirmative act' or 'creates a danger' every time it does anything that makes injury at the hands of a third party more likely. If so, the state would be liable for every crime committed by the prisoners it

---

[131] 54 F.3d 1169, 1175.
[132] 54 F.3d 1169, 1175 citation and quotations omitted.
[133] 54 F.3d 1169, 1175.
[134] 54 F.3d 1169, 1175.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

released."[135]  Would the state be liable if the police placed a dangerous prisoner into a home of innocent citizens through the use of deception and duplicity?

Similarly, would a state actor such as Deborah Thompson be liable for the affirmative action of deceitfully placing two mentally ill, sexually aggressive children –both the victims of incest- into the home of the Johnsons?  Deborah Thompson both "enhanced"[136] the danger by placing Jane Doe back in a foster home with her incestuous brother and she "created"[137] the danger by deceitfully placing a dangerous child in the Johnson's home.  In *DeShaney*, the state actor merely stood "by when it could have acted to prevent a tragedy."[138]  In *Pinder*, the "state functionaries…stood by and did nothing when suspicious circumstances dictated a more active role for them."[139]  The Johnsons claim is based on an affirmative act by the state and not an act of omission.

State actors have a duty to protect people from dangers created by the state.  *See, e.g.*, *See, e.g.*, *Sloane v. Kanawha Sherrif Dep't.*, 342 F. Supp.2d 545 (S.D. W.Va. 2004); *Pullium v. Ceresini*, 221 F. Supp. 2d 600, 605 (D. Md. 2002).  This duty is enhanced when there is a special relationship between the tortfeaser and the victims of the state-created danger.  *See Pinder v. Johnson*, 54 F.3d 1175 (4th Cir. 1995).  The *Pinder* Court reviewed the pre-*DeShaney* body of Substantive Due Process law.[140]  The Court found that all of the cases "involved some circumstance wherein the state

---

[135] 54 F.3d 1169, 1175 citing *Martinez v. California*, 444 U.S. 277, 284 – 285 (1980) (No sate action when released prisoner causes injury).
[136] 54 F.3d 1169, 1175.
[137] 54 F.3d 1169, 1175.
[138] 54 F.3d 1169, 1174.
[139] 54 F.3d 1169, 1175.
[140] 54 F.3d 1169, 1176.

26

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

took a much larger and more direct role in "creating" the danger itself."[141]  Judge Wilkinson,

writing for the Court in *Pinder*, then concluded:

> "When the state itself creates the dangerous situation that resulted in a victim's
> injury, the absence of a custodial relationship may not be dispositive.  In such
> instances, the state is not merely accused of a failure to act; it becomes much more
> akin to an actor itself directly causing the harm to the injured party."

Some courts have likened the state's actions to throwing a citizen into a lions' den[142] or a

snake pit.[143]  Plaintiffs believe that Deborah Thompson, SCDSS actor, placed the snake in the

Johnsons home and as a consequence, the Johnsons, including the clear victim Jane Doe, have had

to live and sleep behind locked doors- virtual prisoners in their own home.

In determining qualified immunity, the Court must follow the two steps created by *Saucier*

*v. Katz*.[144]  Plaintiffs assert that the Due Process Right to have their bodies, home, and liberty free

from the imposition of a state created danger was a clearly established right at the time of its alleged

violation.[145]  Both the Supreme Court (*DeShaney*) and the Fourth Circuit Court of Appeals (*Pinder*)

have recognized that exceptions to *DeShaney* exist.  One such exception is that a state's duty to

protect an individual from third parties arises when the state itself has created the danger to which

---

[141] 54 F.3d 1169, 1176 - 1177.
[142] *Walker v. Rowe*, 791 F.2d 507, 511 (7th Cir.), cert. denied, 479 U.S. 994 (1986); K.H. ex rel. Murphy v. Morgan, 914
F.2d 846, 849 (7th Cir. 1990).
[143] *Walker v. Rowe*, 791 F.2d 507, 511 (7th Cir.), cert. denied, 479 U.S. 994 (1986); *Bowers v. DeVito*, 686 F.2d 616,
618 (7th Cir. 1982).
[144] 533 U.S. 194  (2001)
[145] *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

the individual is exposed.[146]  Applying the submitted facts to the Court in the light most favorable to

Plaintiffs, Plaintiffs believe they have a clearly established right under *Pinder* and *DeShaney*.

Next, the Court must consider whether the right was clearly established at the time such that

it would be clear to an objectively reasonable state actor that his conduct violated that right.  The

Court must ask whether a reasonable social worker could have believed that placement of Jane Doe

for adoption into the Johnsons' home was lawful, in light of clearly established [federal] law in

view of the information gathered by Deborah Thompson.  This is not simply a review of the

abundance of records submitted by Plaintiffs with this response and memorandum.

"The Supreme Court has made clear that the very vagaries of the Due Process Clause mean

that a specific enunciation of the principles of constitutional liability is required. "[147]  Conduct must

violate clearly established *constitutional* rights under *Harlow v. Fitzgerald* and under *Anderson* the

contours of those rights must be clear."[148]  Judge Wilkinson, writing for the Court in *Robles v.*

*Prince George's County*, held that "[t]o equate knowledge of wrongfulness in a generic sense with

knowledge of unconstitutionality in a specific sense is not consistent with the rule of law.  The latter

requires notice, something to which even the worst criminal wrongdoer is entitled."[149]

---

[146] *Deshaney,* 489 U.S. 189, 201; *Pinder*, 54 F.3d 1169, 1176..
[147] *Robles v. Prince George's County*, 308 F.3d 437, 438 (2002) citing *Anderson v. Creighton*, 483 U.S. 635 (1987).
[148] *Robles v. Prince George's County*, 308 F.3d 437, 438 (2002) citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982) and *Anderson v. Creighton* 483 U.S. 635, 640.
[149] *Robles v. Prince George's County*, 308 F.3d 437, 438 (2002)

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

In *Hope v. Pelzer*,[150] the United States Supreme Court held that for "a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."[151] "The "salient question" is whether "the state of the law" at the time of the asserted constitutional violation gave [the officer] "fair warning" that his alleged conduct was unconstitutional."[152]

Plaintiffs assert that Deborah Thompson's violation of the Johnson's Due Process Rights is obvious. Deborah Thompson knew that Jane Doe had been chronically sexually abused by her brother and that she herself had been sexually aggressive with other children in foster care. The Fourth Circuit Court of Appeals in *White v. Chambliss*[153] acknowledges the right of a child in state custody not to be **"**handed over to a foster parent or other custodian, private or public, *whom the state knows or suspects to be a child abuser*." (Emphasis added)

The United States Supreme Court in *Hope v. Pelzer* found that "officials can be on notice that their conduct violates established [federal] law even in novel circumstances."[154] As the Court acknowledged in *United States v. Lanier*,[155] sometimes the "easiest cases don't even arise. There

---

[150] 536 U.S. 730, 739 (2002)
[151] 536 U.S. 730, 739
[152] *Miller v. Prince George's County*, 475 F.3d 621, 631, citing *Hope v. Pelzer*, 536 U.S. 739.
[153] 112 F.3d 731, 737 (1997)
[154] 536 U.S. 730, 741.
[155] 520 U.S. 259 (1997).

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose; the official would be immune from damages…"[156]

"The "salient question" is whether "the state of the law" at the time of the asserted constitutional violation gave [Defendant] "fair warning" that his alleged conduct was unconstitutional.  Although earlier cases involving "fundamentally similar" or "materially similar" facts are "not necessary to such finding," in the case at hand, prior case law with "fundamentally similar" facts is abundant."[157]

Plaintiffs have found no case on point with the same facts as the Johnson's claim.  The only line of cases pertains to cases which put social workers on notice not to put children in danger by placing them with dangerous adults and children.[158]  While those cases focus solely on the placement of the child, it is abundantly clear that a social worker must also take into consideration the safety of the adoptive family, such that the act of placing a dangerous child with aggressive and violent behaviors with an innocent adoptive family is just as dangerous as placing an innocent child in a violent and dangerous home environment.

---

[156] 520 U.S. 259, 271.
[157] *Miller v. Prince George's County, Maryland*, 475 F.3d 621 (4th Cir. 2007) citing *Hope v. Pelzer*, 536 U.S. 730, 741.
[158]*White v. Chambliss,* 112 F.3d at 737 (acknowledging  the right of a child in state custody not to be "handed over to a foster parent or other custodian, private or public, *whom the state knows or suspects to be a child abuser*." ) (Emphasis added); *see also*, *Meador v. Cabinet for Human Resources,* 902 F.2d 474, 476 (6th Cir.1990); *L.J. v. Massinga*, 838 F.2d 118, 123 (4th Cir. 1988) (affirming, though not addressing, the district court's finding that "there existed a constitutional right to protection" for foster children); *Davis v. Dep't of Social Svcs. of Baltimore,* 1991 U.S. App. Lexis 19081, No. 90-1864, at *9; *Yvonne L. v. New Mexico Dep't of Human Servs.*, 952 F.2d 883, 892-93 (10th Cir. 1992); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 797 (11th Cir. 1987) (en banc); *Baby Neal v. Casey,* 821 F.Supp. 320, 335 (E.D.Pa.1993); *Wendy H. v. Philadelphia,* 849 F.Supp. 367, 372 (E.D.Pa.1994).

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

Plaintiffs can, however, point to the body of law which holds that a social worker and

agency must protect a foster child and those children with whom the child is placed.[159]

Additionally, Plaintiffs direct the Court's attention to the portion of the South Carolina Code which

requires social workers to protect children from child abuse:

> S.C. Code Ann. § 20-7-490. Definitions.
> (2) "Child abuse or neglect", or "harm" occurs when the parent, guardian, or other person
> responsible for the child's welfare:
>> (b) commits or allows to be committed against the child a sexual offense as defined
>> by the laws of this State or engages in acts or omissions that present a substantial risk
>> that a sexual offense as defined in the laws of this State would be committed against
>> the child;
>> (f) has committed abuse or neglect as described in subsections (a) through (e) such
>> that a child who subsequently becomes part of the person's household is at
>> substantial risk of one of those forms of abuse or neglect.
> (3) "A person responsible for a child's welfare" includes the child's parent, guardian, foster
> parent, an operator, employee, or caregiver…of a public or private residential home,
> institution...
> (6) "Institutional child abuse and neglect" means situations of known or suspected child
> abuse or neglect where the person responsible for the child's welfare is the employee of a
> public or private residential home, institution, or agency.

The law of South Carolina holds that "'A person responsible for a child's welfare' [which]

includes…an… employee…of a public…agency…"[160] – in this case, an employee such as  Deborah

Thompson.  "Child abuse…occurs when the … person responsible for the child's welfare… allows

to be committed against the child a sexual offense as defined by the laws of this State or engages in

acts or omissions that present a substantial risk that a sexual offense as defined in the laws of this

---

[159] See arguments pertaining to Plaintiff Jane Doe's Due Process Claims below.
[160] S.C. Code § 20-7-490(3)

Plaintiffs' Response to Defendants'
Motion for Summary Judgment

Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA

State would be committed against the child."[161]  Plaintiffs believe that SCDSS through Defendant

Thompson, was responsible for the institutional child abuse of Jane Doe.

After comparing Deborah Thompson's Affidavit with the documents submitted by Plaintiffs

today, is led to only one of two conclusions—either her affidavit was written in bad faith or

Deborah Thompson was plainly incompetent.  "As a matter of public policy, qualified immunity

provides ample protection to all but the plainly incompetent or those who knowingly violate the

law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Deborah Thompson's stated that:

> "During my relationship with Jane Doe, I did not receive any reports of inappropriate
> behavior or inappropriate contact between Jane Doe and Kameron Cox.  Per my
> regular practice, I visited the children regularly and documented all of my contact
> with the children, their foster parents and their prospective parents, Gregory and
> Michelle Johnson.  *At no time did anyone report or suggest, nor did I observe, any
> behaviors which lead me to believe that Jane Doe and Kameron Cox were having
> any inappropriate or sexual contact*."  See Affidavit of Deborah S. Thompson, page
> 3 through 4, attachment to Defendants' Motion for Summary Judgment, emphasis
> added.

The evidence that Jane Doe was sexually abused while in foster care is well documented and

the evidence is almost as certain as any can be had in this type of case, as sex abuse rarely brings

along its own evidence, such as video tape or pictures.

Plaintiffs also assert that Defendants' Deborah Thompson's Affidavit affirms that she was

grossly incompetent and no amount of notice in Defendants own files could have steered her from

her course which has been so destructive..

---

[161] S.C. Code § 20-7-490(2)(b)

Plaintiffs' Response to Defendants'
Motion for Summary Judgment

Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA

## 2. Defendants' affirmative acts violated the due process rights of Jane Doe and Jane and John Does 1 – 10 by knowingly placing them with a sexual predator.

In *DeShaney v. Winnebago County Department of Social Services*[162], a child welfare agency was sued for failing to remove a child from his home even though the agency had notice that the child's father was abusive. In a narrow holding, the Supreme Court held that the Fourteenth Amendment imposes no obligation on public officials to protect children who are not in state custody from violence by non-state actors. 489 U.S. 189, 202 (1989).

In *DeShaney*, however, the Supreme Court explained that the removal of a child from the home and placement in a "foster home operated by its agents" might be "sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect" children from mistreatment by their foster parents. *See id.* at 201 n.9 (citing *Doe v. New York City Dep't of Social Servs.*,[163] *Catholic Home Bureau v. Doe*,[164] and *Taylor ex rel. Walker v. Ledbetter*[165]). Lower courts have consistently held that states have an affirmative duty to protect children whom states place into foster care. *See, e.g.*, *L.J. v. Massinga*, 838 F.2d 118, 123 (4th Cir. 1988) (affirming, though not addressing, the district court's finding that "there existed a constitutional right to protection" for foster children); *Davis v. Dep't of Social Svcs. of Baltimore,* 1991 U.S. App. Lexis 19081, No. 90-1864, at *9; *Yvonne L. v. New Mexico Dep't of Human Servs.*, 952 F.2d 883, 892-93 (10th Cir. 1992); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 797 (11th Cir. 1987) (en banc);

---

[162] 489 U.S. 189, 192-93 (1989).
[163] 649 F.2d 134 (2d Cir. 1981), after remand, 709 F.2d 782 (2d Cir.), *cert. denied sub nom.*
[164] 464 U.S. 864 (1983)
[165] 818 F.2d 791 (11th Cir. 1987) (en banc), *cert. denied*, 489 U.S. 1065 (1989)

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

*Baby Neal v. Casey,* 821 F.Supp. 320, 335 (E.D.Pa.1993); *Wendy H. v. Philadelphia,* 849 F.Supp.

367, 372 (E.D.Pa.1994). Indeed, this duty even includes an obligation to provide children in foster

care with adequate and safe shelter, food, environment, and medical care. *See, e.g.*, *L.J. v.

Massinga*, 699 F. Supp. 508, 537 (D. Md. 1988), *aff'd*, 838 F.2d 118 (4th Cir. 1988); *LaShawn A. v.

Dixon*, 762 F. Supp. 959 (D.D.C. 1991); *Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL

1435428 at *15 (D.Nev. May 14, 2007).


  **3. The Defendants are not entitled to qualified immunity because they knew or
should have known of the dangerous situations created.**

  State actors have a duty to protect people from dangers created by the state. *See, e.g.*, *See,

e.g.*, *Sloane v. Kanawha Sherrif Dep't.*, 342 F. Supp.2d 545 (S.D. W.Va. 2004); *Pullium v. Ceresini*,

221 F. Supp. 2d 600, 605 (D. Md. 2002). This duty is enhanced when there is a special relationship

between the tortfeasor and the victims of the state-created danger. *See Pinder v. Johnson*, 54 F.3d

1175 (4th Cir. 1995). In the present matter, Defendants, after taking custody of the Jane and John

Doe Plaintiffs, placed these children in foster care and even terminated the rights of some of their

parents; this clearly constitutes a special relationship and enhances Defendants' duty to the children

in their care.

  At no time were these children free to escape from their foster homes or from Kameron Seth

Cox. As minors, they were not competent or sophisticated enough to utilize the system or law

34

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

enforcement to address their injuries sustained at the hand of Kameron Seth Cox.[166]  Even when the

children tried to report the rapes, they were ignored.  Thus, Defendants had an affirmative duty not

to place, knowingly these plaintiffs in situations where Defendants knew that Plaintiffs' Due

Process Rights would likely be violated.  *See, e.g.*, *White v. Chambliss*, 112 F.3d at 737

(acknowledging  the right of a child in state custody not to be "handed over to a foster parent or

other custodian, private or public, *whom the state knows or suspects to be a child abuser*." )

(Emphasis added); *see also*, *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 476 (6th

Cir.1990); *Taylor v. Ledbetter*, 818 F.2d 791, 797 (11th Cir.1987)**.**  Defendants failed in this duty by

placing Jane Doe and other Jane and John Doe Plaintiffs with a known rapist.


    **4.  Plaintiffs' exhibits create issues of material fact and suggest that additional
        discovery will lead to relevant evidence supporting Plaintiffs' claims.**

      It is worth noting that, in this case, a substantial amount of discovery has yet to be

compelled from Defendants due to the order to suspend discovery.  In their responses to Plaintiffs'

First Requests for Production, Defendants failed to submit crucial case notes from two of Kameron

and Jane Doe's social workers, David Barnes and Christie Chalmers from May 2001 to December

---

[166] The court was very succinct in *Hernandez v. Texas Dep't. of Protective & Reg. Svcs.*, 2002 WL 31689710 (N.D.
Tex. 2002) (denying defendant's motion for summary judgment and holding that the Texas foster care agency can be
liable for death of baby placed in abusive and neglectful home "by virtue of the *state affirmatively placing an individual
in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of
private aid.*").  Emphasis added.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

2001.[167]  Also, there are few notes from the supervisors of Deborah Thompson, David Barnes, and

Christie Chalmers.  Adoption, Child Protective Services, and Foster Care Policies, Procedures, and

Training Manuals were not supplied to Plaintiffs pursuant to their discovery requests.  The names

and contact information of other victims were not supplied.  Defendants have even refused to allow

both of Plaintiffs' attorneys to review the defendants' original records.

There is no doubt that Kameron and his sister made disclosures of sex abuse early on in their

custodial relationship with SCDSS, with Kameron, Jane Doe, and their birth mother all disclosing

that Kameron had sexually abused his sister.  Jane Doe also disclosed that her mother's boyfriend

sexually abused her.  The children's Child Protective Services cases were even indicated for sexual

abuse.  An "indicated" case of sex abuse is an administrative finding by SCDSS that the child was

sexually abused.

In their argument, Defendants point to the fact that the SCDSS legal counsel did not seek or

prevail in a termination of parental rights (TPR) case against the Jane Doe's and Kameron's parents,

however, such an action is not dispositive in proving that the children were not sexually abused.

There are many reasons why the state will not pursue a particular ground for a TPR against

particular parents.  TPR for neglect is sometimes easier to prove, as it does not necessitate the

testimony of a child.  Additionally, some children who are sexually abused do not want to testify, or

their therapists may determine that a child who testifies against his parents may suffer even greater

---

[167] During this period, Kameron disclosed sexually abusing his sister before entering foster care and Jane Doe disclosed that Kameron had sexually assaulted her while in foster care.  Jane Doe also became sexually aggression and was removed from her foster home because she presented a danger to other children.  See Exhibit B-8.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

emotional damage from the act of testifying in court.  These children were already diagnosed with

PTSD long before the TPRs were scheduled.  In this case, the birth mother actually relinquished her

rights.

The children exhibited severe signs of sex abuse, to include emesis, encopresis, enuresis,

bedwetting, nightmares, interest and knowledge of sexual acts, suicidal ideations, homicidal

ideations, and even vomiting when visiting their abusers (Kameron with his birth mother and Jane

Doe visiting her mother, brother, and mother's paramour).  Most importantly, the children made and

SCDSS recorded a profound number of disclosures of sex abuse.

SCDSS and Deborah Thompson did nothing to protect this little girl from her brother even

after Jane Doe disclosed repeatedly that he had sexually abused her.  There is no ministerial

protection for a state-actor who knows that a particular child is a sexual predator and then places

that same child in foster homes where he has access to other children and then the predator sexually

assaults these innocent children.

SCDSS and Deborah Thompson knew from the predator's own admissions that he had sex

with his sister early on when SCDSS first gained physical and legal custody of the children.  They

knew again when Kameron disclosed, at Marshall I. Pickens in the summer of 2001 that he sexually

molested his sister.  They also were warned in 2001 by therapist Joy Bennett that Kameron and Jane

Doe should be placed together only if Jane Doe is "protected"[168] and in 1999 under "a high degree

---

[168] See Exhibit B-6, Letter from Joy Bennett to Deborah Thompson.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

of supervision…to prevent any abuse to Jane Doe by Kameron."[169]  They were placed on notice

once again when Jane Doe told her foster mother(Cutshall) that her brother had sexually abused her.

Plaintiffs have demonstrated that SCDSS and Deborah Thompson were on notice that (1)

Kameron was a threat, (2) that by placing Kameron in a foster home, group home, or institution

with other children Kameron had access to unprotected children and he was dangerous to the

physical  and mental well-being of these other children and (3) keeping Kameron in the same home

with Jane Doe after she reported to her foster mother that she was raped was, at the very least, a

threat of harm to Jane Doe.  Plaintiffs believe that the evidence presented here demonstrates a

deliberate indifference to a state-created danger, in violation of Plaintiffs' Fourteenth Amendment

rights.  *See, e.g.*, *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990); *Taylor ex rel.*

*Walker v. Ledbetter*, 818 F.2d 791, 795 (11th Cir. 1987) (explaining that "[b]y alleging that the

gross negligence and deliberate indifference of state officials rendered her comatose, the child has

sufficiently pleaded a liberty interest."); *Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134,

141 (2d Cir. 1981).

Finally, Plaintiffs strongly dispute Defendants' claim that they should be entitled to qualified

immunity because the South Carolina Family Court "approved" their work during an adoption

hearing, a similar argument is found in *Malley v. Briggs*[170] and *Miller v. Prince George's County,*

*Maryland*,[171] "*Malley* holds that qualified immunity does not protect an officer who seeks a warrant

---

[169] See Exhibit B-2, Sexual Abuse Assessment for Kameron Cox and Jane Doe.
[170] 475 U.S. 335 (1986)
[171] 475 F.3d 621 (2007)

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

on the basis of an affidavit that a reasonably well-trained officer would have known failed to

demonstrate probable cause."[172]  Similarly, no reasonable social worker would submit to a family

court a background summary that was deliberately false or "with reckless disregard for the

truth…,"[173] as most family court judges would throw out such a case and order that the adoptive

parents be given all relevant and factual information pertaining to the adoptive child—for safety of

both the child and the adoptive family.  But first, any Court would have to be on notice that SCDSS'

packet "for Judge's Eyes Only" was insufficient, misleading, and misrepresentative of the

documented facts!


**B.  JOHN AND JANE DOE PLAINTIFFS SHOULD BE INCLUDED IN THIS ACTION
TO PROTECT THEIR INTERESTS**

As the court stated in *Pinder*, "Qualified immunity thus allows officials the freedom to

exercise fair judgment, protecting "all but the plainly incompetent or those who knowingly violate

the law."[174]  "Qualified immunity under § 1983 shields officials from civil liability unless their

actions violated clearly established statutory or constitutional rights of which a reasonable person

would have known."[175]  The *White* decision was handed down in 1997.  Defendants were aware that

when they are "plainly placed on notice of a danger and [choose] to ignore the danger

---

[172] Miller, 475 F.3d 621, 632.
[173] Miller, 475 F.3d 621, 631.
[174] *Pinder* at 1173 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986).
[175] *Pinder* at 1173 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

notwithstanding the notice,"[176] they have violated a foster child's substantive Fourteenth

Amendment protections.

      State actors have a duty not to place foster children in locations where the state has advance

knowledge that the child will be harmed. *See, e.g.*, *See, e.g.*, *White v. Chambliss*, 112 F.3d 731 (4th

Cir. 1997) (noting the Fourth Circuit has not foreclosed the possibility that an agency could be

liable for displaying deliberate indifference in placing a child into a foster home that was known to

be dangerous); *Yvonne L. V. New Mexico Dep't of Human Servs.,* 959 F.2d 883, 892 (10th Cir.

1992); *Ledbetter*, 818 F.2d at 797; *Doe*, 649 F.2d at 141 (holding that a child in state custody has a

constitutional right not to be placed in a setting known to be unsafe). The Defendants failed in this

duty when they forced Plaintiff Jane and John Does to live with Kameron Seth Cox, a known sex

offender, a rapist, in fact. This failure resulted in Plaintiffs Jane and John Does being repeatedly

raped, in violation of well-established constitutional rights. *See, e.g.*, *Yvonne L. v. New Mexico*

*Dep't of Human Servs.*, 959 F.2d 883, 892-93 (10th Cir. 1992); *Davis v. Dep't of Social Svcs. of*

*Baltimore,* 1991 U.S. App. Lexis 19081, No. 90-1864, at *9; *L.J. v. Massinga*, 838 F.2d 118, 123

(4th Cir. 1988); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 797 (11th Cir. 1987) (en banc);

*Baby Neal v. Casey*, 821 F.Supp. 320, 335 (E.D.Pa.1993); *Wendy H. v. Philadelphia,* 849 F.Supp.

367, 372 (E.D.Pa.1994). Summary judgment should not be granted to Defendants in this claim.

---

[176] *White* at 737.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

### C. THE PLAINTIFFS' NEGLIGENCE CLAIMS AGAINST DEFENDANTS DSS AND THOMPSON ARE VIABLE AND SHOULD SURVIVE

The Johnsons were owed a duty of care by Deborah Thompson, as she should not have intentionally and deceptively downplayed Jane Doe's history of sex abuse and mental illness.[177]

At the time of filing, Plaintiffs were not allowed access to the children's SCDSS files.  The Defendants responded to the Plaintiffs' discovery requests at the end of February, 2008.  Plaintiffs now know that Sharon Cook was Deborah Thompson's supervisor, and Joyce Cruel was the supervisor for Foster Care Worker David Barnes. Plaintiffs believe Kit Lyday was Christie Chalmer's supervisor

The specific dates of Jane Doe's injuries are not known at this time, but she was sexually abused by her brother during her stay in the foster home of Janice Cutshall from September 25, 2000 to June 18, 2001.  Jane Doe was also sexually abused by her brother during one of her stays at the foster home of Brenda and Russell Floyd.  Jane Doe should not have been placed in these homes after both Kameron and Jane Doe had disclosed Kameron's sexual abuse of his sister and Jane Doe disclosed Kameron's sexually abusing her.  Additionally, although therapist Joy Bennett hoped the children could remain together, she warned SCDSS only to place them together if Jane Doe is "protected"[178] and under "a high degree of supervision…to prevent any abuse to Jane Doe by Kameron."[179]   Jane Doe should never have been placed in the Johnson home by Deborah Thompson with her past history of sex abuse and mental illness as this family was not able to deal

---

[177] See Affidavit of Gregory and Michelle Johnson.
[178] See Exhibit B-6, Letter from Joy Bennett to Deborah Thompson.
[179] See Exhibit B-2, Sexual Abuse Assessment for Kameron Cox and Jane Doe.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

with the severe and chronic sex abuse Jane Doe endured.  Lastly, the Johnsons should have been given an accurate and complete background history and medical information so they could have decided for themselves whether Jane Doe was the right child for them, and if so, they could have supplied Jane Doe's therapists, post-adoption, with correct information and history to give them the opportunity to address, properly and timely, Jane Doe's severe sex abuse trauma and mental illness.

The Johnsons were owed a duty of care by Deborah Thompson, as she should not have deceptively downplayed and clearly ignored Jane Doe's history of chronic sex abuse, her tendency to perpetrate sexual activity, and mental illness.[180]


### D.  THE PLAINTIFFS AGREE TO DISMISS CERTAIN DEFENDANTS AND CLAIMS AND ASK FOR OTHERS TO STAY IN THE CASE

Plaintiffs' discovery has led to the conclusion that some defendants and causes of action initially included in this action are no longer supported by the facts.  In the interest of judicial efficiency, Plaintiffs consent or stipulate to the following issues:

### 1.  42 U.S.C. § 1985 does not apply to denial of due process claims

42 U.S.C. § 1985 creates a cause of action for conspiracy to deny equal protection rights but not for conspiracy to deny due process guarantees.  Plaintiffs consent to the Court's dismissing this claim.

### 2.  Defendants Aydlette and Patterson should be dismissed

---

[180] See Affidavit of Gregory and Michelle Johnson.

**Plaintiffs' Response to Defendants'**
**Motion for Summary Judgment**

**Civil Action No.: 3:06-3663-JFA & 3:07-1629-JFA**

42 U.S.C. creates a cause of action for conspiracy to deny equal protection rights but not for conspiracy to deny due process guarantees.  Plaintiffs withdraw this claim.

### 3.  Defendants Aydlette and Patterson should not be dismissed

Plaintiffs have not been establish any facts pertaining to their claims against these persons as Defendants refused/failed to answer any interrogatories or produce any documents related to these claims.[181]  Plaintiffs ask that Defendants' Motion for Summary Judgment as to these two Defendants be denied, pending the opportunity to conduct further discovery.

### 4.  Plaintiffs' Assault and Battery, Outrage, False Imprisonment, and Premises Liability Claims Should be Dismissed

The factual and legal posture of this action do not support some of Plaintiffs' claim

Respectfully submitted,

THE BUTCHER LAW FIRM, PA

s//Robert J. Butcher
Robert J. Butcher
Attorney for Plaintiffs
1124 Little Street
Post Office Box 128
Camden, South Carolina 29020
Phone – 803.432.2088
Facsimile – 803.432.3066
rjbutcher@camdensc-law.com

Camden, South Carolina
April 29, 2008

---

[181] *Jennings v Nester,* 217 F.2d 153(7th Cir. 1954).

43